[799 NYS2d 784]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v M&H USED AUTO PARTS & CARS, INC., et al., Appellants.

Second Department, August 8, 2005

**APPEARANCES OF COUNSEL**

*David Samel*, New York City, for appellants.

*Eliot Spitzer, Attorney General*, New York City (*Robin A. For-shaw* and *Julieta V. Lozano* of counsel), for respondent.

**OPINION OF THE COURT**

RIVERA, J.

In this appeal, arising out of a criminal prosecution for, inter alia, violations of Environmental Conservation Law § 17-0701 (1) (a) and § 71-1933 (4) (a) (i), the primary issue presented, which is one of first impression, is whether the People must prove the culpable mental state "knowingly," as defined under Penal Law § 15.05 (2), with regard to each and every element of those offenses. We conclude that "knowingly" applies to each and every element thereof. We find that the evidence was legally and factually sufficient to establish, beyond a reasonable doubt, the defendants' guilt of violating those sections of the Environmental Conservation Law.

With regard to the subsidiary issues raised by the defendants, namely, that the evidence was legally and factually insufficient to establish their guilt as to the remaining three counts of the indictment, endangering public health, safety or the environment in the fourth degree in violation of Environmental Conservation Law § 71-2711 (3) (three counts), and that the fines imposed were excessive, those contentions are without merit.

## Factual Background

The defendant Mordechay Sasy owns the defendant M&H Used Auto Parts & Cars, Inc. (hereinafter M&H), a vehicle dismantling business, located in Queens County, New York. Between January 1999 and January 2000, the New York City Police Department (hereinafter the police) conducted an undercover investigation of vehicle dismantling businesses. In this regard, an undercover detective posed as a scrap metal processor and purchased 166 "junked" vehicles from M&H.

At trial, the detective testified that, in the course of the investigation, he observed Sasy dismantle vehicles without first draining the fluids, resulting in a discharge of liquids, such as motor oil, antifreeze, and transmission fluid, onto the ground. He stated that he also observed "Speedy Dry," a material used to soak up oil spills, on the ground. The detective further testified that he observed Sasy and his employees empty gasoline into five-gallon pails and, in the process, spill gasoline on the ground.

On June 6, 2000, the detective visited M&H. On that day, it was raining heavily. The detective observed oil and antifreeze on the ground.

On September 27, 2000, the detective, other law enforcement officers, members of the Attorney General's office, and officers of the Department of Environmental Conservation (hereinafter the DEC) executed a search warrant authorizing a search of M&H's yard and office. According to the detective, on that date he observed an 8-by-10-foot puddle of oily soil at the entrance to the yard, and "a lot" of oil and antifreeze covered with Speedy Dry in the yard. In the rear of the yard, the detective discovered in a pit in the ground a sump pump that was plugged in with an electrical cord. An uncoiled hose ran from the sump pump into a hole in the rear wall of an adjoining business, through a galvanized pipe mounted along the interior wall of the adjoining business, and out onto 38th Avenue in Queens. The sump pump was not pumping at the time. However, the detective noticed that there was fluid in the hose. The sump pit was about half filled with water that had an oily sheen and smelled like oil, antifreeze, and gasoline, and water appeared to have been pumped out because the interior of the sump pit was still wet. There were four catch basins at the intersection of 38th Avenue and 126th Street, and when it rained, a "small pond" developed on 38th Avenue and ran from M&H toward 126th Street into the catch basins. A videotape depicting the

condition of the yard, including the sump pit, purportedly taken on September 27, 2000, was played for the jury.

On September 27, 2000, a DEC engineering geologist collected a sample of the liquid from the sump pit to test for petroleum. The sample was tested and found to contain lubricating oil.

The supervisor of water and sewer systems for the New York City Department of Environmental Protection in Queens (hereinafter the DEP) testified that in Queens County, storm sewers carry rainwater via underground pipes out into the nearest waterway. Rainwater enters the storm sewer through catch basins located in the street. In the location of M&H, the storm sewers emptied into Flushing Bay.

The regional permit administrator for the DEC who is responsible for processing applications for environmental permits, including state pollution discharge elimination system or SPDES permits, in the Region II office which covers the five boroughs of the City of New York, testified that an SPDES permit is designed to insure water quality by regulating discharges into bodies of water. An SPDES permit is required for any point source discharge of contaminants into surface waters or groundwaters of the state. A sump pump is a point source and, therefore, anyone intending to operate one is required to obtain an SPDES permit. A diligent search of all SPDES permits issued disclosed that in 1999 and 2000, neither defendant had been issued an SPDES permit.

The People's expert on hydrogeology and solid and hazardous waste management was, as former director of DEC's Solid and Hazardous Waste Program, familiar with the vehicle dismantling business. He described the proper method by which to drain and recapture fluids from vehicles prior to dismantling: the use of a drip pan and funnel to allow fluids to drain into a storage tank. He testified that dumping vehicle fluids onto the ground is not permitted because it has severe environmental implications.

DEC's Region II office has regulatory oversight of vehicle dismantlers and receives annual waste fluid disposal reports required to be filed by junkyards and vehicle dismantlers that report, among other things, how much waste fluids are generated, and where these fluids are disposed. On February 15, 2001, a DEC police officer issued M&H a summons for failure to file an annual waste fluid report for the year 1999 and notified M&H's manager that M&H still had 15 days in which to file the

annual waste fluid report for the year 2000. A search of DEC's records revealed that M&H did not file an annual waste fluid disposal report for the year 2000.

At trial, Sasy testified that from May 1999 through January 2000, he used pans and 55-gallon drums to collect the fluids from the vehicles that he dismantled. He also used carpets in case of leaks and Speedy Dry to absorb any occasional spills. He discarded used carpets and used Speedy Dry with the garbage. Sasy claimed that he used a company named Tri-City Waste Oil to collect waste oils every couple of months and a company named Planet Recovery that collected antifreeze and oil. Sasy produced copies of certain receipts that he claimed were given by Tri-City and Planet Recovery. According to Sasy, the original Tri-City receipts were removed from M&H during the execution of the search warrant. Sasy conceded that the inventory list for documents seized from M&H, which was signed by Sasy, did not reflect any receipts.

Sasy testified that the sump pit and hose were already on the property when he opened M&H in November 1999.

In rebuttal, the People produced two witnesses who testified that, during the investigation, Sasy stated that Planet Recovery took care of his waste oils and antifreeze disposal and that he never mentioned a company named Tri-City Waste Oil. Further, a search of M&H's office did not reveal any receipts for the removal of waste oil or antifreeze.

The indictment charged the defendants with seven counts. The first count charged the defendants with endangering public health, safety, or the environment in the third degree, in violation of Environmental Conservation Law § 71-2712 (4). The second count charged that, on September 27, 2000, the defendants knowingly discharged pollutants into the waters of the State of New York from an outlet or point source without an SPDES permit, in violation of Environmental Conservation Law § 17-0701 (1) (a) and § 71-1933 (4) (a) (i). Counts three and four charged the defendants with endangering public health, safety, or the environment in the fourth degree, by releasing petroleum (count three) and ethylene glycol (count four) on or about June 6, 2000, in violation of Environmental Conservation Law § 71-2711 (3). Counts five and six charged the defendants with endangering public health, safety, or the environment in the fourth degree by releasing petroleum (count five) and ethylene glycol (count six) on or about September 27, 2000, in violation of Environmental Conservation Law § 71-2711 (3). Finally, count

seven accused the defendants of failing to file an annual waste fluid disposal report, a violation of Environmental Conservation Law § 71-2703 (2) (a) and 6 NYCRR 360-12.1 (c).

At trial, the People moved to dismiss count seven of the indictment. At the close of the People's case, the defendants moved for a trial order of dismissal as to the remaining six counts on the ground that the People failed to present legally sufficient evidence to establish those counts beyond a reasonable doubt. With respect to count two, defense counsel contended that there was no evidence that the defendants discharged a hazardous substance into state waters on September 27, 2000, as charged in the indictment. Defense counsel pointed out that, even assuming there was proof that a discharge occurred on that date, there was no evidence that the groundwater at the site had been contaminated and, since the testimony was that it was not raining that day, there was no evidence that any discharge wound up in state waters on that date.

With respect to counts three through six, defense counsel argued that there was insufficient evidence as a matter of law.

In addition, with respect to counts three, four, and six, defense counsel contended that there was no proof that scientific tests were conducted to establish that petroleum or ethylene glycol had been released into the environment at the site and that Detective Wedge's testimony that he saw or smelled such substance was insufficient to establish beyond a reasonable doubt that the defendants released such substance into the environment. With respect to count five, defense counsel contended that there was no evidence that the defendants discharged the petroleum found in the sump pit into the environment on September 27, 2000. The trial court granted the People's motion, dismissed count seven of the indictment, and denied the defendants' motion with respect to the remaining counts.

At the close of all the evidence, the defendants renewed their motion to dismiss counts one through six of the indictment, "relying upon all of the arguments . . . made at the end of the People's direct case" and the defendants' testimony and evidence "which severely undermined the prosecution's arguments." The trial court denied the motion.

The jury found the defendants guilty of committing the crimes charged in counts one through five. The defendants were acquitted of count six. The trial court dismissed count one upon the defendants' motion to set aside the verdict.

By decision and order on motion dated May 6, 2003, this Court granted M&H's motion for a stay of execution of so much of the judgment as imposed a fine against it pending the hearing and determination of the appeal.

## Legal Analysis

### Violations of Environmental Conservation Law

### § 17-0701 (1) (a) and § 71-1933 (4) (a) (i)

Count two of the indictment charged that the defendants "on or about September 27, 2000, lacking a written SPDES permit . . . knowingly made or caused to be made or used any outlet or point source for the discharge of sewage, industrial waste or other wastes or the effluent therefrom, into the waters of the state," in violation of Environmental Conservation Law § 17-0701 (1) (a) and § 71-1933 (4) (a) (i).

Environmental Conservation Law § 17-0701 (1) (a) provides:

"1. It shall be unlawful for any person, until a written SPDES permit therefor has been granted by the commissioner, or by his designated representative, and unless such permit remains in full force and effect, to:

"a. Make or cause to make or use any outlet or point source for the discharge of sewage, industrial waste or other wastes or the effluent therefrom, into the waters of this state."

Environmental Conservation Law § 71-1933 (4) provides, in pertinent part, that "[a]ny person who knowingly, as defined in section 15.05 of the penal law . . . violates . . . any provision of title 7 or 8 of article 17 of this chapter" "shall be guilty of a class E felony."

According to the defendants, the People were required to prove the culpable mental state—"knowingly"—with respect to every element of the above-mentioned environmental crimes. Specifically, they assert that the People were required to prove that the defendants knew that the outlet or point source, herein the sump pump, contained a pollutant, such as petroleum, and that the defendants knew that any discharge of pollutants from the sump pump would end up in state waters.

The defendants failed to preserve these claims for appellate review. These contentions were not advanced with specificity on

the defendants' motions to dismiss (*see People v Gray*, 86 NY2d 10, 19 [1995]; *People v Bynum*, 70 NY2d 858, 859 [1987]), nor did the defendants request that the trial court instruct the jury that the culpable mental state "knowingly" applied to each and every element of the crime. The first time that the defendant raised these claims was in their postconviction motion to set aside the verdict. However, this Court will reach this issue as a matter of discretion in the exercise of our interest of justice jurisdiction.

On the merits, we agree with the defendants that the mental state "knowingly" applies to every element of these environmental offenses.

Our analysis on this issue must necessarily commence with an examination of the plain meaning of the statutory language (*see Bluebird Partners v First Fid. Bank*, 97 NY2d 456, 460-461 [2002]; *Leader v Maroney, Ponzini & Spencer*, 97 NY2d 95, 104 [2001]). The statutory text is the "clearest indicator of legislative intent" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]). As clearly reflected in the plain language of Environmental Conservation Law § 71-1933 (4) (a) (i), the Legislature intended and, indeed provided, that a violation of section 17-0701 (1) (a) of that chapter requires knowing conduct. "Where, as here, the literal language of a statute is precise and unambiguous, that language is determinative" (*Matter of Encore Coll. Bookstores v Auxiliary Serv. Corp. of State Univ. of N.Y. at Farmingdale*, 87 NY2d 410, 417-418 [1995]).

The real quandary is how the mental culpability requirement should be applied. Contrary to the defendants' contention, Penal Law § 15.15 does not resolve this question.

Penal Law § 15.15 provides:

"1. When the commission of an offense defined in this chapter, or some element of an offense, requires a particular culpable mental state, such mental state is ordinarily designated in the statute defining the offense by use of the terms 'intentionally,' 'knowingly,' 'recklessly' or 'criminal negligence,' or by use of terms, such as 'with intent to defraud' and 'knowing it to be false,' describing a specific kind of intent or knowledge. When one and only one of such terms appears in a statute defining an offense, it is presumed to apply to every element of the offense unless an intent to limit its application clearly appears.

"2. Although no culpable mental state is expressly designated in a statute defining an offense, a culpable mental state may nevertheless be required for the commission of such offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such culpable mental state. A statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, should be construed as defining a crime of mental culpability. This subdivision applies to offenses defined both in and outside this chapter."

Penal Law § 15.15 (1) specifically refers to offenses "defined in this chapter." This clear language suggests that this section does not apply to crimes defined outside the Penal Law. The offenses involved in the instant matter are defined in the Environmental Conservation Law, not the Penal Law. For this same reason, the defendants mistakenly rely on *People v Ryan* (82 NY2d 497 [1993]), which involved a crime defined in the Penal Law, not the Environmental Conservation Law.

Similarly, the defendants' reliance on Penal Law § 15.15 (2) is incorrect and misplaced. While this section of the Penal Law states that "[t]his subdivision applies to offenses defined both in and outside this chapter," and thus, applies to the Environmental Conservation Law, as discussed above, a culpable mental state is expressly designated in the environmental crimes at issue (*see* ECL 71-1933 [4] [a] [i]).

Notwithstanding the defendants' seemingly faulty analytical approach, this Court nevertheless concludes that the mental state "knowingly" applies to every element of these environmental crimes. To hold otherwise would impose a quasi-strict liability burden of proof, in contradiction of the subject statute's plain meaning. Moreover, removing the "knowingly" requirement may criminalize innocent conduct (*see e.g. United States v Hayes Intl. Corp.*, 786 F2d 1499, 1504 [1986]).

This Court's conclusion is in accord with federal cases wherein federal statutory counterparts, such as the provisions of the Resource Conservation and Recovery Act, were interpreted to require "knowing" conduct as to all elements thereof. For instance, in *United States v Johnson & Towers, Inc.* (741 F2d 662 [1984], *cert denied sub nom. Angel v United States*, 469 US 1208 [1985]), the United States Court of Appeals for the Third Circuit found that all of the elements of the criminal penalty provision of the Resource Conservation and Recovery Act must

be shown to have been knowing. Similarly, in *United States v Wilson* (133 F3d 251 [1997]), where the defendants were charged with a felony violation of the Clean Water Act, the United States Court of Appeals for the Fourth Circuit concluded that the "knowingly" mens rea must be proven as to each essential element of the offense, but it need not be proven that the defendant knew his conduct to be illegal. The case of *United States v Ahmad* (101 F3d 386 [1996]), also provides persuasive support. In *Ahmad*, the United States Court of Appeals for the Fifth Circuit determined that, with the exception of "purely jurisdictional elements," the mens rea of knowledge applies to each element of the crimes charged (*see United States v Ahmad, supra* at 391).

We note that the People argue at length that the environmental crimes statutes at issue are public welfare statutes. "A public welfare statute is currently one in which 'Congress has rendered criminal a type of conduct that [1] a reasonable person should know is subject to stringent public regulation and [2] may seriously threaten the community's health or safety' " (Webber, *Element Analysis Applied to Environmental Crimes: What Did They Know and When Did They Know it?*, 16 BC Envtl Aff L Rev 53, 85 [1988], quoting *Liparota v United States*, 471 US 419, 433 [1985]). Public welfare offenses require at least that the defendant know that he or she is dealing with some dangerous or deleterious devices or products or obnoxious waste materials (*see e.g. Staples v United States*, 511 US 600, 608 [1994]; *United States v International Minerals & Chemical Corp.*, 402 US 558, 564-565 [1971]). However, these offenses dispense with or eliminate the requirement of mens rea with respect to an element of a crime (*see United States v Balint*, 258 US 250, 252-253 [1922]). Under the particular facts of this case, we defer to the Legislature the question of whether the subject crimes qualify as public welfare offenses so as to dispense with the culpable mental state with respect to one or more of the elements thereof.

Applying the foregoing to the instant case, and viewing the evidence in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620, 621 [1983]), the evidence established that the defendants knowingly used a point source to discharge a pollutant. While there was no direct evidence that Sasy or his employees ever used the sump pump, there was ample circumstantial evidence that the sump pump was operable and in use by the defendants. The sump pump was located

on M&H property, it was plugged in with an electrical cord, there was liquid in the sump pump, a hose led from the sump pump to the street, and the interior of the hose was wet. Significantly, chemical analysis of a sample of the liquid in the sump revealed that the liquid contained lubricating oil. There was an abundance of evidence regarding the detective's observations of the practices by Sasy and M&H's employees regarding the spillage of motor oil, antifreeze, and transmission oil.

██ Moreover, the People proved by legally sufficient evidence that the defendants knowingly used the pump for the discharge of industrial waste into the waters of the state. The supervisor of water and sewer systems for the DEP testified that, in Queens County, storm sewers carry rainwater via underground pipes out into the nearest waterway. Rainwater enters the storm sewer through catch basins located in the street. In the location of M&H, the storm sewers emptied into Flushing Bay. Thus, any petroleum released onto the ground at M&H would eventually be carried out into the waters of the state. There is nothing obscure or uncertain about the People's proof. The defendants' argument that they did not know that the waste would eventually be released into the waters of the state belies common sense.

We reject the defendants' contention that the verdict was against the weight of the evidence. According to the defendants, certain inconsistencies in the testimony render the evidence factually insufficient to support a verdict of guilt as to count two. Any such inconsistencies, as well as the credibility of the witnesses' testimony, were fully explored at trial. The jury's determination should be accorded great weight on appeal and should not be disturbed unless clearly unsupported by the record (see People v Garafolo, 44 AD2d 86, 88 [1974]). Upon the exercise of our factual review power, we are satisfied that the verdict of guilt as to count two was not against the weight of the evidence (see CPL 470.15 [5]).

## Counts Three, Four, and Five

The defendants were convicted of three counts of endangering public health, safety, or the environment in the fourth degree by releasing petroleum (count three) and ethylene glycol (count four) on or about June 6, 2000, and releasing petroleum (count five) on or about September 27, 2000.

Environmental Conservation Law § 71-2711 (3) provides, in relevant part:

"A person is guilty of endangering public health,

safety or the environment in the fourth degree when
. . .

"3. He knowingly or recklessly engages in conduct which causes the release, of a substance hazardous to public health, safety or the environment.

"Endangering public health, safety or the environment in the fourth degree is a class A misdemeanor."

"Release" means "any pumping, pouring, emitting, emptying, or leaching, directly or indirectly, of a substance so that the substance or any related constituent thereof, or any degradation product of such a substance or of a related constituent thereof, may enter the environment, or the disposal of any substance" (ECL 71-2702 [13]). In relevant part, "[d]isposal" means "the discharge, deposit, injection, dumping, spilling, leaking or placing of any substance so that such substance or any related constituent thereof may enter the environment" (ECL 71-2702 [5]). The defendants concede that petroleum and ethylene glycol are substances "hazardous to public health, safety or the environment" within the meaning of Environmental Conservation Law § 71-2711 (3) (*see* ECL 71-2702 [10]).

Viewing the evidence in the light most favorable to the prosecution (*see People v Contes, supra*), we find that it was legally sufficient to establish the defendants' guilt beyond a reasonable doubt of these counts. The detective testified that on June 6, 2000, and on September 27, 2000, he observed oil and antifreeze on the grounds of M&H. Sasy admitted that leaks and spills occurred during the vehicle dismantling process. Contrary to the defendants' contention, the fact that Sasy may have used Speedy Dry to treat spills and leaks does not establish, as a matter of law, that he did not violate the statute.

Moreover, we find unpersuasive the defendants' claim that the verdict was against the weight of the evidence. Even though the People's evidence as to these counts consisted mainly of the testimony of the detective, resolution of issues of credibility, as well as the weight to be accorded to the evidence presented, are primarily questions to be determined by the jury, which saw and heard the witnesses (*see People v Gaimari*, 176 NY 84, 94 [1903]). We find that the jury gave the evidence the weight it should be accorded. Thus, we will not disturb the jury's determination.

### The Fines Imposed

■ The defendants contend that the imposition of fines was harsh and excessive, and should be reduced in the interest of justice. The defendants also claim that the amount of the fines was "grossly disproportionate" to the crimes of which they were convicted. The defendants' position manifests, at best, a lack of understanding as to the seriousness of the crimes they committed, and, at worst, callous indifference to the deleterious effects on the environment caused by their conduct. The fines were clearly intended to deter parties, such as the defendants, from engaging in environmental crimes. "The Environmental Conservation Law was enacted to protect the quality of our environment by controlling 'water, land and air pollution, in order to enhance the health, safety and welfare of the people of the state' " (*Matter of Consolidated Edison Co. of N.Y. v Department of Envtl. Conservation*, 71 NY2d 186, 192 [1988], quoting ECL 1-0101 [1]). Crimes against the environment have critical consequences not only to the public's health and safety, but to the well-being of our entire ecosystem. Thus, one who is found to have violated our environmental laws will be held accountable. Under the facts of this case, we find no basis whatsoever to reduce the fines imposed.

Accordingly, the judgment should be affirmed.

S. MILLER, J.P., SMITH and CRANE, JJ., concur.

Ordered that the judgment is affirmed.