*262 OPINION OF THE COUHT
Carolyn E. Demarest, J.
The instant indictment is unusual in that the Kings County District Attorney has undertaken, pursuant to ECL 71-0403, to prosecute defendant concrete manufacturer, whose facility is located on the banks of Newtown Creek in Queens County, for discharging “matter” into the creek and for failing to comply with various permit requirements of the ECL. (Defendant Quadrozzi is vice-president of the corporate defendant and acted as the corporation’s chief environmental officer in this matter.) Upon an initial superficial review of the grand jury minutes, this court was concerned that certain administrative functions, specifically, the interpretation to be accorded the regulations promulgated by the Department of Environmental Conservation (DEC) and the standards and procedures that govern the issuance of permits by that agency, which are usually vested in the administrative authority, had been, in this case, undertaken, in the first instance, by the grand jury. As a general rule, administrative agencies are deemed to have greater expertise in technical matters entrusted to them and their interpretation and application of their own rules and procedures governing the enforcement of relevant statutes is accorded great weight. (Matter of Gruber [New York City Dept. of Personnel—Sweeney], 89 NY2d 225 [1996]; Matter of Industrial Liaison Comm. of Niagara Falls Area Chamber of Commerce v Williams, 72 NY2d 137 [1988].) Such matters are not generally within the ken of the average grand juror unless evidence has been provided to the grand jury of such administrative procedures.
Because a number of the issues raised herein involve the implementation of the statutory structure for enforcement of the Environmental Conservation Law and implicate a possible conflict between the role of the constitutionally-mandated administrative agency (NY Const, art V, § 2) and the statutorily-designated “prosecutors,” the District Attorney and the Attorney General, this court invited the Attorney General, as chief legal officer of the State (NY Const, art V, § 4), to address those issues. (See NY Const, art XIV, § 5 [requiring notice to the Attorney General of any private suit brought to restrain a violation of the State’s policies respecting the conservation of natural resources].) While contributing invaluable insights into the legislative background, the Attorney General has substantially concurred with the District Attorney’s analysis of the statutory scheme regarding prosecutorial authority, some of which is not *263 disputed by defendants. However, the issue which this court perceives as critical, whether the designated prosecutors are authorized to act independently of the Department of Environmental Conservation in commencing a criminal action, has not been convincingly addressed by either the District Attorney or the Attorney General.
History of the Case
The complaint in this case was initiated by a private environmental organization called Riverkeeper. Much of the evidence before the grand jury was obtained and presented through Riverkeeper’s lead investigator Basil Seggos who monitors the Hudson River watershed, including Newtown Creek which forms the border between Kings and Queens counties. Mr. Seggos testified that, following observations made from a boat of pollution emanating from defendants’ facility, in June 2003, his organization notified the State Department of Environmental Conservation. Not satisfied with the Department’s response, on October 27, 2003, Riverkeeper notified defendants of its intention to commence a private civil action pursuant to the federal Clean Water Act (33 USC § 1251 et seq.).[1] Riverkeeper’s letter invited settlement discussions during the 60-day notice period prior to commencement of suit. Defendant Constantine Quadrozzi promptly responded, indicating defendants’ intent to remedy the problem expeditiously. Mr. Seggos testified, however, that several visits to the site in May, July, September and December 2004 revealed no change in conditions. On September 22, 2004, two investigators from the Brooklyn District Attorney’s Office accompanied Mr. Seggos to the location and samples were taken from the discharge pipe and from the creek. Additional samples were collected on December 8, 2004. This prosecution was commenced on December 9, 2004.
Defendants have moved to dismiss this indictment on a number of grounds. Preliminarily, defendants challenge the authority of the Office of the Kings County District Attorney to prosecute this case. Defendants further contend that dismissal is warranted based on legal insufficiency of the evidence before the grand jury and failure to adequately instruct the grand jury on the law. Defendant Constantine Quadrozzi moves to dismiss the indictment insofar as it charges him individually. Finally, defendants seek dismissal in the interest of justice based, in *264 part, on the People’s failure to honor a plea understanding. Defendants also seek suppression of an illegal search and seek dismissal on the ground that evidence from that illegal search was presented to the grand jury. The issue of the illegality of a search and suppression of evidence would properly be addressed in a Mapp hearing prior to trial and will not be considered further at this point.
Defendants operate a concrete plant located at 46-73 Metropolitan Avenue in Queens. In this 42-count indictment, they are charged with numerous violations of the Environmental Conservation Law between June 9, 2003 and December 8, 2004, by, with criminal negligence, discharging matter into Newtown Creek in contravention of water quality standards (ECL 17-0501), by criminally negligently using an outlet for discharge into state waters without a permit (ECL 17-0505), and by knowingly using an outlet and discharging industrial waste and pollutants from that outlet without a permit issued by the Commissioner of the Department of Environmental Conservation or in violation of such permit (ECL 17-0701, 17-0803).
This court previously cursorily reviewed the grand jury minutes and issued a decision dated February 17, 2005, finding that the evidence adduced before the grand jury was legally sufficient to sustain the findings of the indictment and that the grand jury was adequately and properly instructed on the law. However, at defendants’ first appearance on January 24, 2005, defense counsel reserved the right to raise other substantial legal issues, possibly jurisdictional in nature, that would go to the sufficiency of the indictment. The court indicated that the initial review of the grand jury minutes would therefore be superficial, since defendants expected to raise additional issues. Litigation of such issues was deferred because both sides agreed that a mutually satisfactory disposition, which included defendants’ installation of a remedial system at a cost of $350,000, was likely and would obviate further litigation. Between January 24 and June 30, 2005, this case was adjourned five times upon the understanding that a remedial system was being installed on defendants’ premises which would eliminate the problem and the case would be amicably resolved.
At the grand jury, George Hyde, assistant engineer for the Water Division of DEC, testified that he is the “regional coordinator for storm water” (rain water) and, in response to the notice sent by Riverkeeper of the intent to sue, on August 12, 2003, he visited the facility. Mr. Hyde testified to a conversa *265 tion with defendant Constantine Quadrozzi in which he advised Mr. Quadrozzi of the need to obtain a permit for “storm water discharge” because of the nature of his product. After reviewing the facility with Mr. Quadrozzi, Mr. Hyde suggested that defendant could immediately ameliorate the problem with hay bales or silt fences that would act as erosion and sediment controls so as “to keep storm water runoff out of the creek” (transcript, Dec. 21, 2004, at 9).[2] Mr. Hyde testified that on August 12, 2003, “[t]here was no discharge in that creek” and nothing going down the storm drain. On that day, Mr. Quadrozzi was given a 45-page booklet (exhibit 10) “which spells out the requirements of a storm water permit” and contains an application to be included under a State Pollutant Discharge Elimination System (SPDES) permit.[3] In fact, the document is a SPDES general permit which can be extended to cover any “discharger” of storm water “associated with industrial activity from a point source” by submitting a notice of intent, transfer or termination (NOITT) form to the DEC. Defendants submitted such form on October 12, 2004, and were notified on October 19, 2004, that coverage of their facility was effective.
In the course of motion practice which followed the installation of the remedial equipment in June 2005, this court first became aware of the ongoing discourse between defendants and DEC that had preceded the installation independent of the instant criminal prosecution. Apparently in conjunction with *266 defendants’ efforts to comply with statutory requirements as explained in the general permit (exhibit 10) and required by the DEC, defendants had prepared and submitted a lengthy technical document known as a stormwater pollution prevention plan (SWPPP) describing the proposal to control and treat the discharge of any pollutants (People’s affirmation and mem of law in opposition, exhibit 2). This 27-page document describes the characteristics of the site and the benefits, installation and maintenance of a Vortechnics Vortechs (Vortechs) system in full compliance with the ECL. “DEC Settlement Conference Documents” annexed to the People’s opposition as exhibit I reveal that on October 11, 2005, Udo Drescher, Esq. of DEC’S Division of Legal Affairs had apprised the District Attorney of defendants’ submissions and the ongoing settlement negotiations between defendants and the agency beginning in September and October of 2004. By letter dated January 14, 2005, to defendants’ counsel from Mr. Drescher, the need “to resolve the pending administrative enforcement proceeding” is mentioned. Thus, it seems that, even as the District Attorney was prosecuting the instant criminal action, apparently on his own initiative, the DEC was conducting its own enforcement proceedings.
Authority to Prosecute
The threshold issue raised by defendants challenges the authority of the District Attorney of Kings County to prosecute this case based upon geographical limitations and based upon the commencement of the action independent of the Department of Environmental Conservation.
All parties agree that ECL 71-1933 governs criminal prosecution of the violations of article 17 of ECL charged herein. Enacted in 1949 as part of the Water Pollution Control Act, ECL 71-1933 (9) unequivocally provides: “All prosecutions under this section shall be instituted by the department or the commissioner and shall be conducted by the Attorney General in the name of the people of the state of New York.”
ECL 71-1933 (10) provides:
“In the prosecution of any criminal proceeding under this section by the Attorney General and, in any proceeding before a grand jury in connection therewith, the Attorney General shall exercise all the powers and perform all the duties which the District Attorney would otherwise be authorized or required to exercise or perform, and in such a *267 proceeding the District Attorney shall exercise such powers and perform such duties as are requested of him by the Attorney General.”
Thus, with respect to criminal liability for violations of ECL 17-0501, 17-0505, 17-0701 and 17-0803, the Attorney General was designated the exclusive authority to prosecute criminally “with all the powers and duties of a District Attorney,” but had the authority to request the District Attorney to prosecute in his stead.
In response to the Court of Appeals affirmance in People v Long Is. Light. Co. (41 NY2d 1049 [1977]), of the decision of the Appellate Term, 9th and 10th Judicial Districts (88 Misc 2d 123 [1976]), holding that district attorneys lack authority to prosecute air pollution violations pursuant to ECL 71-2105 (3), which contains language identical to that contained in ECL 71-1933 (9) governing the prosecution here, ECL 71-0403 was enacted in 1980 “to amend the environmental conservation law, in relation to the delegation of the Attorney General’s enforcement authority” (Bill Jacket, L 1980, ch 738). The stated purpose of the legislation, initiated by the Attorney General, was to permit the Attorney General to delegate routine criminal enforcement authority, that is, the actual prosecution of cases in the courts, to local district attorneys or to attorneys in the local DEC regional offices in locations where the Attorney General did not have sufficient resources (Attorney General Legis Program 1979-1980 [No. 104]). The proposed legislation would capitalize on the expertise of the local DEC staff attorneys in the interest of increased efficiency. The new statute is of general application and was incorporated into ECL article 71, which covers enforcement procedures and penalties for all of the various substantive provisions contained in other articles of the ECL. However, enforcement procedures are not the same for all violations of the ECL but vary depending on the nature of the infraction. (See, e.g., ECL 71-0703 [relating to violations of article 9 governing protection of lands and forests to be prosecuted by the District Attorney in the first instance; Attorney General authorized to prosecute only if requested by DEC Commissioner pursuant to Executive Law § 63 (3)]; People v Fox, 253 AD2d 192 [3d Dept 1999].)
Thus, ECL 71-0403 does not trump the more specific limitation contained in ECL 71-1933 respecting enforcement of article 17. (See People v Long Is. Light., 88 Misc 2d 123, supra, *268 affd on mem at App Term 41 NY2d 1049 [1977]; Cimo v State of New York, 306 NY 143, 148 [1953] [“The absence of an express provision in a later statute, for repeal of an earlier one, gives rise to a presumption that repeal was not intended”]; Matter of Board of Mgrs. of Park Place Condominium v Town of Ramapo, 247 AD2d 537, 537 [2d Dept 1998] [“It is well settled that, in a conflict between a statute of general applicability and one of special applicability, the special statute controls”].) ECL 71-1933 (9) expressly provides that “[a]ll prosecutions” for violations of titles 1 through 11 and 19 of article 17 must be “instituted by the department or the commissioner” and “conducted” by the Attorney General. ECL 71-0403 permits both the Attorney General and the District Attorney to “initiate or conduct” a prosecution “on behalf of the department.”
Defendants have alleged two impediments to the District Attorney’s prosecution of this action based upon the language of ECL 71-0403 which provides:
“Delegation of criminal enforcement authority “Whenever the attorney general is authorized under this chapter to prosecute a criminal proceeding on behalf of the department, such authority may in the discretion of the attorney general be delegated to the department, to initiate or conduct any such prosecution. Provided, however, that in any event the district attorney of the county in which the violation occurs may initiate or conduct any such prosecution.”
Defendants argue that because section 71-0403 states that only the District Attorney “of the county in which the violation occurs” may initiate or conduct a prosecution, the District Attorney of Kings County may not prosecute the defendants in Kings County, since defendants’ premises is located, and the alleged violation occurred, in Queens County. The People argue that, according to the legislative history and Bill Jacket of Laws of 1980, chapter 738, enacting ECL 71-0403, there was “no intent to impose artificial restrictions on local prosecutors’ powers.” (People’s affirmation at 10.)
Citing ECL 71-0101 which provides that the Penal Law and the Criminal Procedure Law control over the provisions of the ECL to the same extent they controlled over the laws from *269 which such provisions were derived,[4] the People contend that the Kings County District Attorney has geographical jurisdiction pursuant to Criminal Procedure Law § 20.40 (4) (c) and County Law §§ 700 and 927. CPL 20.40 (4) (c) provides that an offense committed within 500 yards of the boundary of a particular county, and in an adjoining county of this state, may be prosecuted in either county. County Law § 700 (1) provides that “it shall be the duty of every district attorney to conduct all prosecutions for crimes and offenses cognizable by the courts of the county for which he or she shall have been elected.” (County Law § 927 [makes the provisions of section 700 applicable to the counties of New York City].)
Witnesses at the grand jury estimated the width of Newtown Creek at the point of the discharge. Riverkeeper’s Basil Seggos testified that it was about 40 yards to Brooklyn from the rowboat he was sitting in in the photograph entered as exhibit 2 (transcript, Dec. 9, 2004, at 6) and pointed out the Brooklyn shoreline pictured across the waterway with the discharge point in the foreground, shown in People’s exhibit 5. George Stadnick, DEC’S marine resource specialist, testified that the distance between the Brooklyn and Queens shorelines was 200 feet (transcript, Dec. 21, 2004, at 26). Exhibit 13 is an aerial photograph that, together with testimony, shows that defendants’ facility is approximately 100 yards from the Kings County border which is the midline of Newtown Creek. The evidence establishes that the site of the alleged offense is within the 500 yard jurisdictional limit and that the Kings County District Attorney has geographical jurisdiction to prosecute this case.
Defendants further argue that ECL 71-1933 (9) restricts the authority of both the Attorney General and the District Attorney to criminally prosecute by providing that only the DEC may “institute” or authorize such prosecution. The People respond that the authority of the District Attorney is greater than that of the Attorney General and that “the District Attorney may act in opposition to the Attorney General’s intent.” (People’s supp mem in opposition at 12). The People insist that ECL 71-0403 gives them unfettered right to prosecute independent of the DEC and irrespective of the language of ECL 71-1933.
*270 One of the critical issues herein concerns the interpretation of “institute,” “initiate” and “conduct” as used in those statutes.[5] A letter submitted to this court from the Office of the Attorney General on behalf of the Attorney General and DEC, states: “[T]here is no prerequisite that DEC ‘institute’ an action in order for the Attorney General or District Attorney to prosecute ECL § 71-1933 crimes.” There is no dispute that ECL 71-0403 gave the District Attorney concurrent authority to prosecute, but it is argued, based largely on legislative history, that the use of the word “institute” in 71-1933 “cannot be read” to require preliminary DEC action prior to initiation of a criminal prosecution.
However, a review of related provisions of title 19 of article 71 governing enforcement of titles 1 through 11 of ECL article 17 suggests to this court that that is exactly what is required. For example, ECL 71-1927 provides:
“The Commissioner is hereby authorized to:
“1. Institute or cause to be instituted in a court of competent jurisdiction proceedings to compel compliance with the provisions of titles 1 through 11 inclusive and title 19 of article 17 or the determinations and orders of the commissioner.”
The use of the disjunctive unequivocally expresses the legislative intent to confer upon the Commissioner authority to “institute” both criminal and civil prosecutions and that his authority is not limited to actions predicated on the failure to comply with his administrative decisions.
Contrary to the Attorney General’s contention that the word “institute” has no meaning in the context, the defendants’ suggestion that DEC action or authorization is a prerequisite to criminal prosecution is consistent with the nature of administrative authority. Just as, pursuant to the express statutory authority contained in ECL 71-1933 (9), criminal prosecution by the Attorney General can only be conducted upon institution by the DEC or the Commissioner, the District Attorney must also be guided by the findings and determinations of the Commissioner. This does not mean that every criminal prosecution must be preceded by a full-blown administrative hearing and determination, but only that, contrary to the People’s suggestion, the District Attorney may not work independent of, or even in op *271 position to, the DEC. It is the role of the Commissioner to determine in the first instance when a criminal prosecution for a violation of DEC’S standards is warranted. Since, under ECL 1933 (9), prosecution is to be instituted only by the Commissioner or the DEC when the Attorney General is the prosecutor, ECL 71-0403, which confers authority on the District Attorney to act in place of the Attorney General, cannot confer greater authority upon the District Attorney in disregard of clear legislative direction.
Concern over a possible conflict of authority and the potential for dual prosecution is reflected in the legislative debates which preceded the enactment of ECL 71-0403 upon which the District Attorney’s authority is predicated. In the Assembly, the following colloquy took place (NY Assembly Debate Transcripts, June 14, 1980, at 10,573-10,574, regarding L 1980, ch 738):
“mr grannis: When we started this bill we had just the delegation to the DEC attorneys for both civil and criminal actions. We went back and forth, and at the request of Senator Lack we put in an inclusion for the criminal prosecutors, authorizing the DA to prosecute under the Environmental Conservation Law where in any case the Attorney General could have done so.
“mr cochrane: Lines 17 and 18 provides the DA may initiate or conduct any such prosecution. When may he, will he be asked by the DEC or by the Attorney General, or will he wander in on his own?
“mr grannis: He can initiate as if he were the AG in lieu of the AG. The delegation of the prosecution powers, again Senator Lack’s request, does not apply to everything. The DAs bring these actions.
“mr cocHRANe: We can have the DEC, under the auspices of the Attorney General and the DA running a parallel investigation?
“mr grannis: We went back and forth on this, and Senator Lack was my guidance on this particular point. He claims if that kind of dual issue came up that the court would resolve who would prosecute. There would not be a concurrent investigation by both the DA and the DEC attorney. The court has to decide who will procees [sic] and the other will be precluded.”
It is clear from this exchange that the Legislature, in enacting ECL 71-0403, did not intend to give the District Attorney unfet *272 tered authority, greater than that conferred on the Attorney General, to interpret, apply and criminally prosecute violations of the ECL. Rather, consistent with the statutory scheme, the constitutionally-created administrative agency was to remain in charge and retained the authority to determine standards, investigate sources of pollution and determine when a violation has occurred. (See, e.g., ECL 17-0301, 17-0905.) In the first instance, the Commissioner is charged with the duty to assess the need for and conditions of, and to ultimately issue, permits. (ECL 17-0701, 17-0703, 17-0804.) Pursuant to ECL 17-0303 (4) (c), it is the Commissioner who is “authorized to: . . . Institute or cause to be instituted in a court of competent jurisdiction proceedings to compel compliance with the provisions of this article [relating to titles 1 to 11 and 19] or the determinations and orders of the commissioner” (emphasis added). This statute makes clear that the Commissioner’s authority prevails, not only over the administrative proceedings conducted within the DEC, but also as to court proceedings, including criminal prosecutions.
As the Assistant District Attorney himself acknowledges, quoting McKinney’s Consolidated Laws of NY, Book 1, Statutes § 231: “In the construction of a statute, meaning and effect should be given to all its language, if possible, and words are not to be rejected as superfluous when it is practicable to give to each a distinct and separate meaning.” Legislation must be construed as a whole, giving due consideration to its intended purpose and harmonizing all provisions so as to give effect to that purpose. (McKinney’s Cons Laws of NY, Book 1, Statutes §§ 96, 97, 98.) The word “institute,” while not precisely defined, suggests that the Commissioner would act as a complainant, having investigated and evaluated the nature and quality of the violations. This term, viewed in the statutory context, is easily distinguished from the words “initiate or conduct,” relating to prosecutorial authority to file an accusatory instrument, make a grand jury presentation and litigate a criminal prosecution on behalf of the complainant. While it is true that a grand jury has authority to investigate criminal behavior and indict when appropriate, requiring input from the agency constitutionally invested with the authority to interpret and implement the law does not contravene the integrity of the grand jury any more than does permitting the District Attorney, as prosecutor, to instruct on the law.
Much of the enforcement scheme of the ECL contemplates civil procedures. As the District Attorney suggests, this may be *273 a case of first impression with respect to criminal prosecution of article 17 violations by the District Attorney.[6] A review of the relevant provisions of the ECL and the legislative history of ECL 71-0403 has convinced this court that ECL 71-1933 requires some form of action by the Commissioner to institute a criminal prosecution, be it by request pursuant to Executive Law § 63 (3), by acting as the complainant or by formal direction to the prosecutor, before either the Attorney General or the District Attorney may initiate such action in a court of law. The failure to establish the authority to prosecute renders any indictment fatally defective. (People v Gilmour, 98 NY2d 126, 135 [2002]; People v Fox, supra.) Notwithstanding the ADA’s repeated hearsay representations that various DEC officials and Westchester County District Attorneys had expressed agreement with the prosecution of this case, the testimony of two officials of the DEC at the grand jury, and the submission of the Attorney General on behalf of the DEC as well as himself disputing that such prior authorization is required, there is no evidence in this record that the DEC instituted the prosecution. In fact, the failure of the People to come forward with an affidavit of the Commissioner stating that the prosecution had been authorized gives rise to the reasonable inference that DEC did not authorize it. The burden to establish authority to bring the action is upon the prosecution. (People v Gilmour, supra.) The People having failed to sustain their burden, the motion to dismiss on the grounds that the District Attorney acted without authority is granted.
*274 Sufficiency of Evidence and Adequacy of Instruction
Defendants have moved to dismiss the entire indictment based upon alleged deficiencies in evidence and improper or inadequate legal instructions. The wisdom of the statutory scheme requiring initial assessment of an alleged violation by the DEC as a prerequisite to instituting suit is apparent in the grand jury presentation here.
Counts 12 through 42 of the indictment all require proof that defendants were discharging a pollutant through an “outlet” or “point source” into Newtown Creek without required permits or in violation of such permit. As previously noted (n 2), the District Attorney left to the grand jury the determination as to what the discharge actually was, whether storm water or something else, leaving the jurors to decide what type of permit was required apparently based upon exhibit 10. Such invitation to speculate would itself render the presentation defective. However, more troubling than the absence of proof from a competent witness as to exactly what type of permit was required, is the absence of affirmative evidence that defendants lacked a permit on the dates charged. The People presented testimony from two DEC officials, including George Stadnick whose job is to review permits, but neither testified that he had searched the records of the Department and found no permit. (See People v M&H Used Auto Parts & Cars, Inc., 22 AD3d 135 [2d Dept 2005].) Rather, the People rely on the inference that defendants did not possess a valid SPDES permit in compliance with the designated statutes until October 19, 2004, based upon the testimony of DEC’s George Hyde that, on August 12, 2003, he handed Mr. Quadrozzi the 45-page booklet denominated “General Permit” containing the NOITT application, advising him that he needed a permit, and that Mr. Quadrozzi failed to respond that he had such a permit, and upon the testimony of Basil Seggos that he did not observe the sign required to be posted for a SPDES permit upon defendants’ premises. While the testimony of Mr. Seggos that he did not see a sign may constitute evidence that defendants did not comply with the statute requiring such posting, it does not establish that defendants did not have a permit. The failure to post a sign is not one of the allegations contained in the indictment.
Nor did any witness explain the procedure for obtaining coverage for storm water discharges or for obtaining permits for other discharges. The grand jury was left to analyze and interpret exhibit 10 for itself. Because there was insufficient *275 context presented to the grand jury that would enable them to make findings regarding the existence of, or the necessity for, a permit of any kind, the grand jury presentation was defective as to counts 12 through 42 and those counts must be dismissed.
The court further notes that George Hyde was not asked and did not testify about the efforts of defendants to comply with DEC requirements although he was the DEC official designated to process defendants’ NOITT and SWPPP and would have had personal knowledge of the proposal to install Vortechs. (See letter of Sept. 8, 2004 from Thomas Rudolf, Deputy Regional Water Engineer, to Constantine Quadrozzi, contained in People’s affirmation in opposition, exhibit I.) It is presumably this omission that defendants contend constituted a failure to present “exculpatory” evidence in violation of the District Attorney’s obligation to make a fair presentation to the grand jury. While the People are not obligated to present all evidence in their possession favorable to the defendant (People v Lancaster, 69 NY2d 20 [1986]), it is important, especially in a case as complex as this, to provide full and accurate information. Evidence of pending proceedings before the DEC might well have influenced the outcome before the grand jury.
Motion to Dismiss Against Quadrozzi Individually
Defendant Quadrozzi argues that there is no proof that he knowingly violated any provisions of the ECL. However, the evidence is that, in response to the Riverkeeper letter of October 27, 2003, Constantine Quadrozzi admitted he was aware of a waste water problem. He is a vice-president of the corporation and has been identified as the person responsible for managing environmental compliance in documents filed with the DEC. Mr. Quadrozzi’s discussions with Mr. Hyde and his execution of the NOITT establish his personal knowledge of the allegedly illegal activity. While the mens rea of knowledge must be established for offenses defined in the ECL, “it need not be proven that the defendant knew his conduct to be illegal.” (People v M&H Used Auto Parts & Cars, Inc., 22 AD3d 135, 144 [2005], supra.) The evidence before the grand jury was clearly sufficient to support the allegations against Constantine Quadrozzi.
The Clayton Motion
Defendants have moved for dismissal of the indictment pursuant to People v Clayton (41 AD2d 204 [2d Dept 1973]). Their *276 motion rests in part upon alleged “misconduct” of the People in failing to honor an agreement to accept a noncriminal plea after defendants had fully performed the bargain by installing the Vortechs system at a cost in excess of $350,000.
A review of the bucksheet in this case, which first came before me on January 24, 2005, reveals that on February 17, 2005, the People stated that they would have no plea offer pending the remedying of the conditions. On March 3, counsel for defendants represented that the remedy was in progress and stipulated to toll the period to prosecute while defendants completed the installation of a Vortechs system. On May 12, 2005, the system was ready for installation and a date of June 1 was set for inspection by the District Attorney and DEC engineer George Hyde following installation. On June 7, the system was reported to be operational but no inspection had taken place. An engineer’s report was provided to the District Attorney and the case was adjourned to June 23 for “dispo.” On June 23, the inspection had been completed and the DEC reported that it was satisfied that the condition had been fully remedied. The case was again adjourned to June 30 “for dispo.” On June 30, 2005, the People made their first plea offer: an E felony for the corporate defendant, a $500,000 fine and asset forfeiture, with a plea to a violation by the individual defendant. This proposal was unacceptable to defendants and a supplemental motion schedule was established. The briefing and argument of the issues has continued for over 11 months. During the course of motion practice, as previously noted, this court first became aware of the negotiations with DEC that paralleled the criminal prosecution.
Defendants have argued that this court must enforce the plea purportedly promised to them in off-the-record discussions both in the courtroom and in meetings with the District Attorney, citing People v Curdgel (83 NY2d 862 [1994]), and several federal cases. Curdgel is distinguishable from the case at bar in several respects but none more relevant than the fact that a very specific plea agreement had been reached. Here, the record is clear that no specific plea was offered to defendants until June 30, 2005. There is, therefore, nothing for the court to “enforce.” The law in New York is clear that purported plea bargains that have not been judicially approved on the record do not bind the parties and are unenforceable (People v Curdgel, id.).
However, the totality of the evidence, including exchanges between counsel herein and between the DEC and counsel for *277 defendants, reveals that defendants were acting in good faith to remedy the problem of contamination from their facility and were led to believe that their efforts would avoid a criminal conviction. It is true, as the People note, that defendants did not secure the required permit until October 2004, 14 months after George Hyde presented them with the “application” contained within the general permit in August 2003. However, the SWPPP was apparently a necessary component of defendants’ SPDES application and obviously required lengthy and complex scientific analysis to complete. Clearly, defendants were acting expeditiously to remedy the problem. Moreover, as reflected in the foregoing recitation of the facts, defendants were in consultation with DEC agents, including George Hyde, even as the District Attorney continued to prosecute. Discussions before this court, both on- and off-the-record, suggested that a noncriminal disposition would be granted defendants as soon as the District Attorney confirmed that the Vortechs system was operational and the DEC was satisfied. Defendants were particularly concerned to avoid a criminal conviction because they feared such a record would seriously jeopardize the substantial amount of work they were doing on both federal and state construction projects. Contract requirements for the City School Construction Authority, the City of New York, as well as federal agencies, mandate that contracts be awarded only to a “responsible bidder” with a record of business integrity. A criminal conviction would be noted in the City’s VEN-DEX system and might result in disqualification. (See Procurement Policy Bd Rules for City of NY [9 RCNY] §§ 2-08, 4-10; NY City School Constr Auth Rules [21 NYCRR part 9600]; Federal Acquisition Regulations [48 CFR] § 9.402 [b].)
In People v Clayton (supra, 41 AD2d at 207), interpreting CPL 210.40, the Appellate Division noted that dismissal is authorized in the discretion of the court where prosecution or conviction would constitute or result in injustice. The criteria to be considered include: (a) the seriousness and circumstances of the offense; (b) the extent of harm; (c) evidence of guilt; (d) the history, character and condition of defendant; (e) any serious misconduct of law enforcement; (f) the purpose and effect of imposing sentence; and (g) the impact of a dismissal on public confidence in the justice system and on the welfare of the community.
This court would not characterize the District Attorney’s conduct herein as “misconduct” as defendants suggest. It is *278 clear, however, that the defendants were induced to waive statutory time constraints and invested in excess of $350,000 in the Vortechs system in the belief that a noncriminal disposition would be offered. Instead, the District Attorney “offered” essentially a top-count plea with a sentence that the court could have imposed without the consent of the District Attorney. Given the several defects in the adequacy of the grand jury presentation which, while not found to be sufficient to justify outright dismissal of the indictment, lead this court to believe would be likely to result in a dismissal or acquittal at trial, the evidence of guilt is hardly compelling.
The District Attorney is to be congratulated for ridding this County of the adverse effects of defendants’ discharge of contaminated storm runoff into Newtown Creek. The offenses charged are not insignificant, but they are common. Defendants have submitted news articles and press releases from the District Attorney’s Office describing charges brought against other businesses guilty of similar violations. Several such perpetrators avoided prosecution upon remedying the problems at their facilities. All parties agree that defendant Quality Concrete is now in full compliance with ECL requirements. Other than the instant case, there is no evidence of other criminal activity of any kind. Thus, having completely remedied the problem at great expense, there appears to be no additional benefit to be derived to the community by further prosecuting defendants. Indeed, given the possible consequences of a criminal conviction in the loss of government contracts and the possibility that the defendants’ business would be significantly downsized or even closed as a result, the community may itself suffer serious losses in jobs, tax revenue and competing vendors for public projects were defendants to be convicted.
Given the totality of these considerations, the motion to dismiss the indictment in the interests of justice is granted.
[Portions of opinion omitted for purposes of publication.]

. The federal requirements of the Clean Water Act are mirrored in the New York State Environmental Conservation Law.

. On November 6, 2003, Mr. Hyde returned to inspect defendants’ premises because it had rained heavily the night before. He observed hay bales along the shoreline and the trench running toward the creek and “the discharge was clear” (transcript, Dec. 28, 2004, at 12).

. Based on Mr. Hyde’s testimony and various other evidence, both defendants and this court understood that the alleged violations stemmed from defendants’ discharge of storm water containing contaminants through a pipe into Newtown Creek. Inexplicably, the Assistant District Attorney (ADA) has indicated in his affirmation and memorandum of law in opposition that this is a “fundamental misunderstanding of the theories of this prosecution.” In his instructions to the grand jury (transcript, Dec. 28, 2004, at 9) the ADA instructed the jurors: “In this case, it is for you to determine whether the discharge in this case was only storm water and/or whether a SPDES permit covered any other of the observed discharge.” Such an instruction was clearly confusing and called for speculation on the part of the grand jurors. Moreover, the People relied upon testimony that no sign was observed indicating possession of a SPDES permit to establish that defendant Quality did not possess such a permit in violation of ECL 17-0505, 17-0701 and 17-0803. The grand jury was correctly instructed that, pursuant to ECL 17-0815-a, such a sign was required unless the discharge is only storm runoff. However, no evidence was presented that would suggest that the discharge was other than contaminated storm runoff.

. The ECL is a compilation of various related statutes previously contained in other laws such as the Public Health Law, the Environmental Conservation Law and the Agriculture and Markets Law.

. According to Webster’s New Universal Unabridged Dictionary (1989), “institute” means “3. to set in operation: to institute a lawsuit” (emphasis added); “initiate” means “1. to begin, set going, or originate”; “conduct,” as a verb, means “2. direction or management; execution.”

. The cases cited by the People as evidencing a long history of direct prosecution by the District Attorney do not relate to article 17 violations but concern enforcement of provisions in which the District Attorney is authorized to prosecute directly. In People v Oceana Term. Corp. (77 Misc 2d 6 [Crim Ct, Bronx County 1974]), prosecution was initiated, not at the direction of the District Attorney, but upon issuance of a summons by a police officer pursuant to the Navigation Law. The court noted that the matter was not, “and probably could not,” be prosecuted under the ECL (at 8). People v Heath (77 Misc 2d 215 [Schuyler County Ct 1974]) involved the taking of a deer out of season, a violation of ECL article 11. People v Catterson (92 Misc 2d 817 [Suffolk Dist Ct 1978]) involved a prosecution by the District Attorney pursuant to ECL 71-0505 for taking shellfish from uncertified waters. To the extent that that decision supports the People’s position, it is implicitly overruled by the Court of Appeals decision in People v Long Is. Light. Co. (supra). It is noted that the ECL violations for which the District Attorney has direct prosecutorial authority tend to involve clear factual issues (e.g., killing a deer out of season, cutting down a tree), unlike the instant prosecution which involves highly technical scientific investigation and analysis by experts.